Good morning, Your Honors. May it please the Court, I am Michelle Buehler, and I am appearing here today on behalf of the Appellants Mazda Motors of America and Insurance Company of North America. The issue before this Court is a relatively simple one. It is whether or not the form selection clause contained in the Bills of Lading apply to in-rim claims asserted against the vessel Cougar Ace. The issue is one of contract interpretation only. The various public policy arguments advanced by the Respondent have absolutely no bearing on this issue. Public policy does not come into play until it is first determined that the form selection clause applies to the parties and claims at issue. You're making your argument focus on the Himalaya Clause? I would be happy to turn to the Himalaya Clause. The Himalaya Clause does not apply to the carrying vessel for various reasons. And the first and probably the most fundamental reason is because the vessel itself is a party to the Bill of Lading pursuant to the ratification doctrine. And it makes absolutely no sense to treat the vessel as a third-party beneficiary to the same contract, and even the District Court recognized that, yet it went on to address the issue. But even if you were to get beyond this issue and assume that it is theoretically possible for the carrying vessel to also be a third-party beneficiary to the Bill of Lading, reading this Bill of Lading as a whole indicates that the vessel was not intended to be a Himalaya Clause beneficiary. But, Counsel, wasn't the Cougar Ace an, in quotes, servant, agent, or subcontractor of the carrier in this case? No, Your Honor. The reason is the term vessel is separately defined in the Bills of Lading. And if the intent were to include the vessel within the scope of the Himalaya Clause, that defined term would either be included in the Himalaya Clause itself or alternatively within the definition of subcontractor. And I refer the Court back to the case cited in our brief, Sun Bar Materials, which made a similar distinction with regard to a rail carrier. The point being that when the party is specifically defined, the absence of that defined term is significant. And the Court should not assume that it comes within the ambit of a broader term. But we're talking, these are almost terms of art, particularly in connection with Admiralty and Bills of Lading and the like. And aren't you stretching the point a little bit to suggest that the carrier would not be included under the defined term that I just mentioned? If the term vessel was not defined in the Bill of Lading, I would concur that it comes within the definition of subcontractor. However, you cannot ignore the fact that the term is separately defined. And that term is a capitalized term, a defined term, which is used repeatedly throughout the Bill of Lading at least 37 times. And if it had been the drafter's intent to include the vessel within the Himalaya Clause, you certainly would expect to see that term either in the Himalaya Clause itself or the carrier definition. In this case, is it fair to say that if the Himalaya Clause applies, you have a problem? If it doesn't apply, you win? Is that your take of it? If the Himalaya Clause applies, I do have a problem. But I don't even think you get to the contract analysis. I don't think you get there. But I'm just saying, it seems that is the knob of the issue before the Court today is whether the Himalaya Clause applies. Well, in no case has the Court ever held that the Himalaya Clause applies to the carrying vessel. I mean, it just seems completely illogical that that could ever happen. The vessel is a party to the contract. The Himalaya Clause is designed to protect third parties and to give them the benefits of the Bill of Lading that are conferred upon the parties of the Bills of Lading themselves. So I just don't even see how you get to that point. In other words, since the carrier is part of the contract, it can't possibly be a third-party benefit. Exactly. And furthermore, an additional point, and this goes back to contract interpretation, which is at the heart of this case. Under Respondent's interpretation of the Bill of Lading, they contend that the first part of the Himalaya Clause prohibits in-rem claims against the vessel. I believe that's a strained interpretation. But even accepting that interpretation, again, if you look at the Bill of Lading as a whole, it clearly contemplates that claims will be made against the vessel and anticipates that will happen because the Bill of Lading itself expressly extends protections to the vessel to limit its liability. And I'm referring to the package limitation and the suit time limitation. Isn't an in-rem action against the ship the normal way in which this is done in admiralty? Is that the most common way in which claims against the ship or its owner are made? Where you seize the ship? Yes, well, that's the only way you can make an in-rem claim against a vessel. Right, exactly. Alternatively, you can sue the owner in persona. Right. But that highlights the distinction, the personification doctrine, that the vessel is viewed as a juristic person in its own right. Right. And so claims can be made independently against either. Any other questions regarding the Himalaya Clause? Okay. I think my main point is it gets back to the fact that this is a case of contract interpretation. The respondent has raised a multitude of public policy arguments, none of which apply in the context of this case. Public policy does not become an issue until it is first determined that the clause applies to the claim. Reading, and the parties, excuse me, reading this bill of lading makes abundantly clear that this form selection clause, by its plain and ambiguous terms, only applies to the Carrie Mitsui OSK lines. In every single case that is construed, the applicability of a form selection clause to an NRAM claim, the courts have merely interpreted the words before them. And in no case has the court disregarded the plain terms of a form selection clause, which is limited to in personam claims, and applied it to an NRAM claim. All we're asking the court to do is follow all of the decisions that have construed form selection clauses based on their terms and hold that the form selection clause does not apply to the NRAM claims asserted against the Cougar race. If there are no further questions, I'll reserve the remainder of my time. You may do that. Thank you. Good morning, your honors. May it please the court. I'm Philip Lempereer with Kiesel, Young & Logan, appearing for the appellee claimant, M.O.B. Cougar Party Limited, which is the owner of the defendant, M.O.B. Cougar Ace. There are at least three reasons why this court should affirm the district court's upholding of the form selection clause here. The first one is the longstanding view that the courts have held of not allowing the uniquely American fiction of the personification of the race to frustrate compelling interests or to distort fundamental contract rights. That's exactly what would happen here if the court requires this case to go forward against the ship in the United States while the same case is going forward in Japan. Do you agree? I'll ask you the same question that I asked your opposing counsel. Do you agree that if the Himalaya clause doesn't apply, you have a problem? I don't, Your Honor. I don't agree. Okay. Why is that? Primarily because there's alternate basis to get there. One is the Himalaya clause. The alternate basis is the appellants want this court to put on blinders and to say this is strictly a case of contract interpretation. Interpreting the contract is very simple. If you look at the form selection clause, it says claims against the carrier, and it doesn't say and vessel. I concede that point. That language is not there. That, however, simply begs the question. When the court looks at the body of case law that's developed, going back to the City of Norwich case over 120 years ago, how do courts treat claims involving this, again, unique American fiction of the personification of the race? The courts have to look at that body of case law as it has evolved over time. Related to that, although somewhat separate, is the sea change that has occurred, and I don't think that's an overstatement. It may be a pun, though. It is a pun, and a bad one, I admit it, Your Honor. The sea change that's occurred over the last 37 years with regard to how courts interpret form selection clauses and their views towards enforcing them. So we start with the personification of the race doctrine, and we go back to the consumer imports case from the Supreme Court in 1943, followed up by the Continental Grain case, I believe, in 1959. What those courts have held is, where there is a compelling interest, the courts will not recognize the personification of the race. In consumer imports, the issue was the fire statute. The fire statute says that a ship owner shall not be liable if damage is caused by fire. The claimant argued, as the appellants here do, that because the statute referred only to the ship owner and not to the vessel, that the aggrieved cargo owner could pursue its in-rem claim against the vessel. And the Supreme Court said, no, we're not going to do that. That would be an absurd result. This fiction that is designed to provide essentially security or credit for a claimant so they don't have to chase a ship owner all over the world is not going to be used to create an absurd result of saying,  because, as the court there, referring back to the City of Norwich decision, said, I'm talking about this. I take your point about the compelling interest in the personification of the race. But I want to pursue what your opposing counsel said. You acknowledged that treatment of the owner and the vessel are different in the bill. She makes the point that the Himalaya Clause couldn't possibly apply to the subagent because that's for a third-party beneficiary, and a party to the contract can't be a third-party beneficiary. What's your response to that? There's two responses, Your Honor. First of all, based on that discussion that I just provided about the personification of the race, I think my counsel would agree that to the extent that the cargo interest here brought a claim against the vessel owner, the claimant, who I'm actually appearing here for, MOB, Cougar Party Limited, the Himalaya Clause would apply. I submit that based on the clear holdings regarding the personification of the race and not applying it to create an absurd result, we can't say that if the Himalaya Clause provides the benefit of the Forum Selection Clause to the vessel owner, that it doesn't apply it to the vessel in rem because we have the situation that we have now, where I'm standing here in Portland, Oregon, defending this claim on behalf of the vessel owner, who's the claimant to the vessel, while the parties are litigating this case. You're saying they can't have it both ways. Correct. But there's a second reason as well, Your Honor. When we look at the language in the Bill of Lading, on record page 35, definitions, the fourth definition is subcontractor, and it refers to owners and operators of vessels involved, such as my client here, agents and servants, and then what I'd like to focus the Court's attention on is the final language of that definition. And anyone assisting the performance of the carriage. Well, if the personification of the race means anything, it means that the vessel is a person that's assisting in the carriage of the cargo. So the Himalaya Clause applies both because it applies to the vessel owner, I think my opposing counsel would agree to that, and because the vessel is someone that's covered by this definition here. The fact that the vessel may be defined, that's because this is the carrying vessel, is referred to repeatedly throughout the Bill of Lading because it needs to be. They designate the port of discharge where the vessel shall discharge the cargo. There's a myriad of reasons why it's addressed there. Your Honor, you look like you have a question. No. Okay. So that's, Your Honor, my answer to why the Himalaya Clause applies here, and it applies two ways. Well, the language... Every time I read this, I see something different in it. But in paragraph two... You're not suggesting you're at sea. Yeah. Don't make me sick. All right, enough of this. Vessel in the merchant undertakes that no claim and so on. Your Honor, that, yes, that's the Himalaya Clause itself. I know it is. And it says, or upon any vessel owned or operated by any of them. Correct. That language precludes the cargo claimants from bringing any claim against the ship owner, owners, operators, et cetera, the folks that are identified there. That clause is not enforceable under the United States Carriage of Goods by Sea Act. This Bill of Lading applies to carriage of cargo throughout the world, from Australia to Europe, from Indonesia to Africa. There are going to be clauses that are enforceable in some countries and unenforceable in others. What matters, and I think that's anticipated because the next sentence says, if they do bring a claim, all of those people listed there are entitled to the benefits of the Bill of Lading as the carrier is. So that's what I was... That I understood. So I was going to go to that. So you're saying that the foregoing includes the description of vessel owned or operated by any of them. Correct. Correct. That's the purpose of the Himalaya Clause, is to take the... It wouldn't make any... Now, I'm just trying to think. I mean, I take the counsel's point that vessel is a divine term, and you go to the form selection, it doesn't have capital V, vessel or any vessel. But when you go back to this clause and it talks about any vessel owned or operated, I'm not sure why it would be... I mean, that would apply to the party described. That would be the most logical vessel to be targeted by this. So I think I understand the argument. I'm just puzzling it out as I'm reading it again. And, Your Honor, that's why I say the Himalaya Clause applies to both the vessel owner because it... No, I understand where you come from, where you can come out on it. Okay. See if I have any questions as I think it through. There's also references to... The other point I want to address in my remaining time is the ratification doctrine, which is the third reason why the court should uphold the district court's ruling here. And that is when a ship sets sail with cargo on board, the vessel is deemed to have ratified the bill of lading. And what that requires or provides is that the vessel owes the same duties and obligations to the cargo to safely carry it to destination as the carrier owes. And I think we've thrown the term around that the vessel is a party to the bill of lading. Well, the vessel is an inanimate object. A vessel can't be a principal to a bill of lading any more than this table or the doorknob over there. What it means under the personification of the race doctrine is that the vessel can be held liable for damage to the cargo that is caused by a lack of due diligence by the carrier. Courts have held, under the United States Carriage of Goods by Sea Act, that because of this ratification doctrine, the vessel and its owners, in fact, can become carriers and owe the same duties under the bill of lading and have the same rights and benefits and immunities. That can be found at Mondial United Corporation, and I have a site for that. 316F2nd at page 172. So either the vessel is a carrier, and as a carrier, it's entitled to enforce the terms of the bill of lading including the Foreign Selection Clause, or if it's not a carrier, then it is entitled to all the benefits of the Himalaya Clause both through its owner and through, in its own right, as a party that is providing... Assisting performance of the carriage. Exactly, Your Honor. Counsel, what was that site one more time, please? Mondial United Corporation is 316F2nd at page 172. Thank you. Thank you, Counsel. Thank you. Ms. Buelow, you have some rebuttal time remaining. There are several points I'd like to make in response to opposing counsel's argument. First of all, the Court has never collapsed the distinction between the vessel and its owner in the context of a contract interpretation case. Both consumer imports and Continental involved a statutory interpretation, and the Court in Monroe specifically recognized that when distinguishing a contract, it's an entirely different situation. I take your point about collapsing it, but do you agree with opposing counsel's comment about the ratification doctrine that the vessel sets sail, that the vessel is deemed to have ratified the bill of lading and therefore is a part of and beneficiary of its terms and obligated under its terms? Yes. When the vessel sets sail with the cargo, the vessel ratifies the bill of lading and becomes bound to the terms of the bill of lading as written. I mean, that's the key point here. The ratification doctrine does not give the vessel, you know, carte blanche all the rights that may be available to the owner under the bill of lading or the carrier, whether it be the charter. What case would you cite that proposition, that the vessel's rights and duties under the bill of lading are different than those of the carrier owner? They're only different insofar as the bill of lading states that they're different. Oh, I understand if it specifically states that, but other than that, under the ratification doctrine, aren't they very positive basically? Well, I would refer the Court to, I think it's the Likes Lines case. Do you have a cite on that, please? I do. Okay. Likes Lines. Likes, L-Y-K-E-S, Lines at page 325, and I don't have it in front of me, but the Court there talks about the ratification doctrine and makes a statement under that doctrine that the carrier becomes bound to the terms of bill of lading and must fulfill the contract consistent with those terms. And that's the point I'm making here, is that whatever the bill of lading says, good, bad, or indifferent, is binding on the vessel. Counsel's point that there's been this sea change with regard to the enforcement of form selection clause is completely irrelevant here because, again, that issue goes to the enforcement of an otherwise enforceable form selection clause. And in every single case where the Court looks at, well, I'll move on here. I want to keep the Himalaya Clause since I'm running out of time. Under the Himalaya Clause, the owner cannot assert the defense of the form selection clause on behalf of the owner. And, again, this highlights the distinction between the owner and the vessel, which this Court itself recognized in all Pacific trading. And finally, I guess my last point is that under the ratification doctrine, the vessel is not a carrier for purposes of CAWGSA, although courts have held that. If you look at CAWGSA, the term vessel is defined separately from carrier, and CAWGSA imposes its rights and liabilities on the carrier and the vessel independently. Thank you, Counsel. Thank you. We appreciate the arguments that both of you have brought to us today on this. Interesting stuff. Yeah. Different from our usual fare. The case just argued is submitted, and we are ready to hear D'Avico v. GlaxoSmithKline Pharmaceuticals.
judges: Graber, Fisher, Smith